## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY E. PROCTOR, ) | Civil Action No. 2:13-cv-1284 |
| ) | |
| Plaintiff, ) | |
| ) | United States Magistrate Judge |
| v. ) | Cynthia Reed Eddy |
| ) | |
| SGT. BURKE, C. O. HART, ) | |
| CAPT. BEYERS, HEARING EXAMINER ) | |
| P. McKISSOCK, ) | |
| ) | |
| Defendants. ) | |

### MEMORANDUM OPINION AND ORDER

CYNTHIA REED EDDY, United States Magistrate Judge.

Plaintiff, Anthony E. Proctor, is a *pro se* state prisoner committed to the custody of the Pennsylvania Department of Corrections ("DOC") and at all times relevant to this lawsuit was incarcerated at SCI-Mercer. Plaintiff has filed this civil rights suit pursuant to 42 U.S.C. § 1983, naming as Defendants the following SCI-Mercer officials and employees: Sgt. Burke, C.O. Hart, Capt. Byers and Hearing Examiner P. McKissock. Discovery is now complete.

Presently pending is the Motion for Summary Judgment filed by Defendants, with brief in support (ECF Nos. 21 and 22) and Plaintiff's Memorandum of Law in Opposition thereto. (ECF No. 28). The parties have consented to our jurisdiction.[1] The Court has reviewed the record. Accordingly, the Defendants' Motion is ripe for disposition. For the reasons that follow, the Motion will be granted.

---

[1] Under the Federal Magistrate Judges Act ("the Act"), a Magistrate Judge's jurisdiction may be conferred by consent of the parties. 28 U.S.C. § 636(c). Under the Act, "[u]pon consent of the parties, a full-time United States magistrate judge . . . may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court." 28 U.S.C. § 636(c)(1). Consent of all parties to a case gives the magistrate judge full "authority over dispositive motions, conduct of trial, and entry of final judgment, all without district court review." *Roell v. Withrow*, 538 U.S. 580, 585 (2003).

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343(a).

## I. STANDARD OF REVIEW

In adjudicating a motion for summary judgment, we apply the well-established legal standard presently set forth in Fed. R. Civ. P. 56(a), pursuant to which summary judgment shall be granted when no genuine dispute exists as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When applying this standard, the court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *UPMC Health Sys. v. Metropolitan Life Ins. Co.,* 391 F.3d 497, 502 (3d Cir. 2004). The burden then shifts to the nonmovant to come forward with specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–461 (3d Cir. 1989) (the nonmovant must present affirmative evidence -- more than a scintilla but less than a preponderance _ which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party "cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument," *Berckeley Inv. Group. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006), but must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. *Celotex*, 477 U.S. at 322; *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue."

2

*Podobnik v. U.S. Postal Serv.,* 409 F.3d 584, 594 (3d Cir. 2005).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The inquiry, then, involves determining "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990), *cert. denied*, 501 U.S. 1218 (1991) (quoting *Anderson*, 477 U.S. at 251-52). "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." *Pignataro v. Port Auth. of N.Y. & N.J.*, 593 F.3d 265, 268 (3d Cir. 2010) (citing *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997)).

With this standard in mind, we review the evidence of record. Except as otherwise indicated, the following facts are undisputed.

## II. BACKGROUND FACTS

In support of their Motion, Defendants have submitted numerous Declarations of DOC employees as well as DOC documentation of the misconduct reports and subsequent disciplinary hearing reports. Plaintiff has also submitted an "Affidavit of Confession" to support his version of events. [ECF No. 25].

### A. Misconduct B 172125

On July 27, 2011, Defendant Charles Hart, a yard officer at FCI-Mercer responsible for observing the outside yard and supervising inmate movement, saw Plaintiff attempt to enter the yard at an improper time. [ECF No. 24-1]. Defendant Hart told Plaintiff to return to his cell

and wait until his unit was called, which he did. [ECF No. 24-3 ¶ 4]. Upon Plaintiff's return to the prison yard at the appropriate time, Defendant Hart told Plaintiff to step aside for a pat search. [ECF No. 24-3 ¶5]. Such searches are randomly conducted throughout the prison to maintain discipline and ensure the safety and security of inmates and staff. [ECF No. 24-3 ¶ 6]. Plaintiff refused to comply with Defendant Hart's orders, and grew "verbally abusive and visibly agitated." [ECF No. 24-3 ¶ 7]. He was ordered numerous times to stand still and keep his arms up. Plaintiff did not comply as he kept turning around and eventually put his arms down. [ECF No. 24-4 ¶8]. According to the Misconduct Report filed that day, Plaintiff stated "If I whipped one of you pigs asses, you would quit picking on a n-----." [ECF No. 24-1 at 2]. While Defendant Hart placed Plaintiff in handcuffs, Plaintiff "insisted on making movements in an apparent attempt to free himself." [ECF No. 24-3 ¶ 9]. Plaintiff refused to walk. [ECF No. 24-4 ¶ 10]. With the help of another officer, Officer Hart attempted to escort Plaintiff to the Restricted Housing Unit ("RHU"), however Plaintiff continued to make "threatening movements" and they placed him on the ground until other officers could assist. [ECF No. 24-3 ¶ 10].

Responding to the call for help, Defendant Shift Commander David Byers witnessed Plaintiff's yelling, and gave Plaintiff two direct orders to be quiet and comply with orders, but Plaintiff refused. [ECF No. 24-5 ¶¶ 4, 5]. Additionally, Defendant Thomas Burke, a sergeant in charge of the outside yard, its correctional officers and inmates, ordered Plaintiff to comply with orders, including submission to a pat search, and when Plaintiff refused, Defendant Burke contacted control and all movement in the yard was stopped. [ECF No. 24-4 ¶¶ 2, 7, 8]. Eventually, the officers proceeded to carry him to the RHU. [ECF No. 24-3 ¶¶ 10, 11]. Defendant Hart describes Plaintiff's behavior as "verbally abusive and physically combative"

4

during the entire escort. [ECF No. 24-3 ¶ 12]. The Misconduct Report notes that Plaintiff ordered the officers to carry him, stating, "Not one of you would look at me on the street, carry me[,]mother f---ers." [ECF No. 24-1 at 2].

According to the Plaintiff's version of events, defendants were retaliating against him for an incident which occurred approximately three (3) weeks prior. Plaintiff states that he grew frustrated with inmate Keith Davis' treatment of Davis' cellmate Cannon and Plaintiff punched Davis in the face and knocked him on his back while in the prison yard. [ECF No. 25 at 3]. Plaintiff claims that a rumor was circulating that Plaintiff was the person who had punched inmate Davis. [ECF No. 25 at 4]. About one week after the fight in the prison yard, Plaintiff contends that Defendant Burke ordered Plaintiff out of his cell and asked him if he knew anything about the assault on inmate Davis. Plaintiff replied, "I don't know what you are talking about. I have no comment about Keith" and invoked his "Constitutional Right to Free Speech" and his "Fifth Amendment right to remain silent." [ECF No. 25 at 4.] Defendant Burke then ordered Plaintiff back to his cell. According to Plaintiff, a week later, another officer named Petre, with Defendant Burke observing, conducted a pat search and further "custodial interrogation" about the fight with Davis. [ECF No. 25 at 5].

Defendants Hart, Burke and Byers each have filed declarations in which they deny retaliating against Plaintiff, deny discussing inmate Davis with Plaintiff, deny knowing Davis, and deny knowing anything about an alleged altercation involving Davis in the summer of 2011 [ECF No. 24-3 ¶¶ 13, 14, 15, ECF No. 24-4 ¶¶ 12, 13, 14, 15, ECF No. 24-5 ¶¶ 14, 15, 16].

These three Defendants' understanding is buttressed by the declaration of Christopher Meure, the Intelligence Gathering/Security Captain at SCI-Mercer in charge of conducting investigations into allegations of abuse by staff members. [ECF No. 24-7 ¶ 1, 2]. Captain

Meure, in conducting an internal investigation into Plaintiff's allegations of abuse against Defendant Hart, found no evidence of any alleged inmate on inmate assault in the summer of 2011 involving inmate Davis or Davis' cellmate Cannon. [ECF No. 24-7 ¶¶ 5, 6]. Captain Meure explained that had inmate Davis been involved in an altercation, inmate Davis would not have been eligible for his ultimate transfer to SCI-Fayette in August 2011 to attend a welding program. [ECF No. 24-7 ¶ 7].

Regardless, on the day of the pat search, once subdued, Plaintiff was taken to RHU and placed in administrative custody pending a misconduct hearing. He was charged with (i) threatening an employee, (ii) using abusive, obscene or inappropriate language to an employee, (iii) presence in an unauthorized area; and (iv) refusing to obey an order ("Misconduct B 172125") [ECF No. 24-1]. The record indicates that the pat search incident occurred at approximately 6:35 p.m. [ECF No. 24-1 at 2].

### B. Misconduct B 288794

Later that evening, at approximately 9:15 p.m., Defendant Byers came to Plaintiff's cell in the RHU and ordered him to put his hands through the wicket so that his hands could be photographed. [ECF No. 24-2 at 2]. Photographs of known or possible injuries are required to be taken immediately following any such incident to ensure that the injuries are not agitated to imply wrongful actions. [ECF No. 24-5 ¶13]. Plaintiff held his hands up but he refused to let them be photographed. He subsequently was issued a misconduct for refusing to obey an order. ("Misconduct B 288794"). [ECF No. 24-2]. No injuries were seen on his hands. [ECF No. 24-6]. Plaintiff permitted photographs to be taken of his chin, which had a small abrasion on it from turning his head repeatedly when he was lying on the sidewalk shouting at staff. [ECF No. 24-5 ¶11]. Plaintiff continued to be housed in the RHU pending his misconduct hearing. [ECF No.

24-2 at 2].

## C. The Disciplinary Hearings

On August 3, 2011, Defendant Hearing Examiner McKissock conducted a misconduct hearing on Misconduct Report B 172125. At the hearing, Plaintiff stated that he felt "set up." Defendant McKissock continued the hearing so that she could view a video of the incident. [ECF No. 24-1 at 3].

On August 10, 2011, the hearing was resumed and Defendant McKissock rendered her decision, finding Plaintiff guilty of (i) threatening an employee; (ii) using abusive, obscene or inappropriate language to an employee; and (iii) refusing to obey an order. [ECF No. 24-1 at 3]. Plaintiff was found not guilty on the charge of presence in an unauthorized area. [ECF No. 24-1 at 3]. Plaintiff was sanctioned to 150 days in disciplinary custody, effective July 27, 2011.

That same day, Defendant McKissock also conducted a hearing on Plaintiff's Misconduct B 288794. [ECF No. 24-2]. At the hearing, Plaintiff stated that he did not need to testify against himself and that if Defendants wanted a picture of his hands, they needed a court order. [ECF No. 24-2 at 4]. Defendant McKissock rendered her decision, finding Defendant Byers version of events more credible than Plaintiff's; she found Plaintiff guilty and sanctioned him to 30 days in disciplinary custody, concurrent with the sanction issued for Misconduct B 172125. [ECF No. 24-2 at 4]. The hearing examiner's decision and sanction were upheld on appeal. [ECF No. 24-2 at 7].

## D. The Videotape

The videotape of the incident was made part of the record by defendants and we have reviewed it. [ECF No. 24-8]. The video is five minutes and nine seconds long. The recording originates from a handheld camera and begins after Plaintiff had been handcuffed and was in the

7

process of being carried toward the RHU. Four individuals in uniform are walking on an outside prison sidewalk, carrying Plaintiff. Plaintiff yells, "Carry me!" He is face down, head forward, with his arms behind his back and handcuffed at the wrist. He holds his legs straight and rigid and his body is completely flat. He does not struggle or resist. Two officers are lifting him from underneath each of his bent arms, and two officers are at his feet. The distance walked by these four officers appears to be between 75 and 100 yards. Their walking is labored; Plaintiff is a large man. He is placed on the ground twice so that the officers could reposition themselves. [ECF No. 24-8]. The first resting point occurs at 0:45 into the video recording. At one point a fifth officer, possibly a supervisor, recommends that the officers switch places so that the ones initially in the front, where the bulk of Plaintiff's weight appears to be, can move to the rear carrying position at his ankles. They do so and continue carrying him. Plaintiff says, "Earn your keep. Earn your f------ keep." The officers proceed in this fashion for some time.

They stop to rest a second time. One of the officers has one of his knees resting on Plaintiff's back, the other knee is on the ground. Plaintiff complains "Get off my back, I can't breathe." The same officer asks Plaintiff if he is willing to stand up and walk, and Plaintiff refuses. The officer repositions himself and squats beside Plaintiff. Plaintiff says, "You're too f----- lazy to carry me." The officer then signals to a person outside the frame of the video camera, motioning and mimicking the steering of a car. An individual drives a medical cart – not unlike a golf cart – over to where Plaintiff is lying motionless on the ground. The Plaintiff continues cursing and is then placed on a stretcher which is affixed to the passenger side of the medical cart. He remains prone and handcuffed as he is set down. The officers remain outside the cart and lift him onto it from the side. As he is set down, the top portion of his body touches the stretcher first, and his eyeglasses appear to be repositioned. The Plaintiff says something

about his eyeglasses. The driver of the cart takes the glasses off of him. He is then driven to a building, with one officer sitting on the cart, riding at Plaintiff's feet, and the other officer jogging next to the moving cart and applying pressure with one hand to Plaintiff's shoulder area, presumably to keep Plaintiff from rolling off the moving vehicle. Upon arrival at a prison building, plaintiff is lifted off the cart and carried into a holding cell, where he is placed on the floor and locked in.

Throughout the video recording, Plaintiff is heard sporadically swearing at the officers [ECF No. 24-8]. At no point is Plaintiff's face shoved or forced into the ground. [ECF No. 24-8]. Plaintiff does not appear to have any cuts, bleeding or bruises.[2]

According to Plaintiff, 55 seconds of the videotape have been intentionally "suppressed" and "is a non-verbal confession from the defendants that unlawful and excessive physical force was used against the Plaintiff at the yard gate area." [ECF No. 25 at 11]. Defendants have not responded to this allegation, however, we note that the hand held recording begins some distance away from Plaintiff and the four guards who are carrying him. The person who is recording appears to be approaching from another area of the prison and walks several paces before he gets close to the group, and then stays close to the group the remainder of the recording.

### III. DISCUSSION

Plaintiff has brought his claims pursuant to 42 U.S.C. § 1983 ("Section 1983"), which provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or

---

[2] In *Scott v. Harris* 550 U.S. 372 (2007), the United States Supreme Court rejected a plaintiff's version of events because a videotape confirmed the defendant's version of the facts, and noted that "[w]hen opposing parties tell two different stories, one of which is *blatantly contradicted* by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380 (emphasis added).

usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. Section 1983 does not create substantive rights. It only allows plaintiffs to recover damages for violations of rights protected by other federal laws or by the United States Constitution. *Wilson v. Garcia*, 471 U.S. 261, 278 (1985); *DiBella v. Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005) ("Title 42 U.S.C. § 1983 is not a source of substantive rights but a vehicle for vindicating rights conferred by the U.S. Constitution or by federal statute."). In order to recover in a section 1983 action, plaintiff must prove two essential elements: (1) defendants deprived the plaintiff of a right secured by the Constitution or laws of the United States; and (2) the deprivation of the federal right occurred under color of any statute, ordinance, regulation, custom, or usage of any state or territory. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 150 (1970); *Groman v. Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995).

Plaintiff contends that Defendants Burke, Hart, and Byers retaliated against him for invoking his "right not to incriminate himself" when they unreasonably stopped and pat searched him, issued him two misconduct reports, and placed him in the restricted housing unit ("RHU"). Plaintiff also asserts that the rulings of the hearing examiner, Defendant McKissock, were "retaliatory actions" designed to "further the 'retaliatory conduct' of the correction officers." Plaintiff further claims that Defendants each violated his "Constitutional Rights to due process of the law and to be free from cruel and unusual punishment in regard to Department of Correction's administrative custody procedures."

In their motion for summary judgment, Defendants argue that Plaintiff (i) has failed to establish a claim of retaliation, (ii) has failed to establish a protected liberty interest and a

violation of his right to procedural due process a claim under the Fourteenth Amendment, and (iii) has failed to establish an Eighth Amendment violation. The Court will address these arguments *seriatim*.

## A.     Retaliation

"Retaliation for the exercise of a constitutionally protected right is itself a violation of rights secured by the Constitution . . . ." *White v. Napoleon,* 897 F.2d 103, 111-12 (3d Cir. 1990). To state a claim for retaliation, an inmate must show that (1) he engaged in some type of constitutionally protected conduct; (2) he was subject of an adverse action by prison officials "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights;" and (3) there was a causal relationship between the two.[3] *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001) (quoting *Allah v. Seiverling,* 229 F.3d 220, 225 (3d Cir. 2000)).

Defendants argue that even assuming Plaintiff could satisfy the first two elements of a prima facie retaliation claim, he fails to establish the third required element, causation. The Court employs a burden-shifting regime to determine whether a causal link exists. The prisoner bears the initial burden of proving that his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him or retaliate against him. *See id.* (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 87 (1977)). The burden then shifts to the defendants to prove by a preponderance of the evidence that they would have taken the same disciplinary action even in the absence of the protected activity. *See id.* If defendants prove that

---

[3]     The crucial third element, causation, requires a plaintiff to prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. *See Lauren W. ex rel. Jean W. v. DeFlaminis,* 480 F.3d 259, 267 (3d Cir. 2007); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503–04 (3d Cir. 1997).

they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest, they will prevail in the retaliation action. *See id.* at 334.

Because retaliation claims can be easily fabricated, district courts must view prisoners' retaliation claims with sufficient skepticism to avoid becoming entangled in every disciplinary action taken against a prisoner. *See Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996); *Woods v. Smith,* 60 F.3d 1161, 1166 (5th Cir. 1995); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Finally, allegations of *de minimis* acts of retaliation do not state a claim under § 1983. *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999); *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001) (holding that a *de minimis* retaliatory act is outside the ambit of constitutional protection).

Defendants argue, inter alia, that Plaintiff has not met his burden and that there is no genuine issue of material fact as to the retaliation claim because the finding of guilt against Plaintiff on the charged misconduct is sufficient to show that the issuance of the misconduct was reasonably related to a legitimate penological interest, and that Plaintiff would have been charged regardless of any protected activity he was engaged in. *See Carter v. McGrady*, 292 F.3d 152, 159 (3d Cir. 2002).

We agree. No reasonable factfinder could find that the Defendant officer's conducting the pat down and ordering Plaintiff to comply with that order were the result of a retaliatory motive. The decisions were appropriate under the circumstances and in accordance with prison regulations. There is no evidence to contradict these assertions. Plaintiff was told to return to the yard during an appropriate time, and upon his return, refused to follow the order to undergo a pat search. Pat searches are routinely conducted throughout the institution for safety and

disciplinary reasons. It is clear that Defendant Hart and his colleagues had a duty to enforce prison regulations and that the carrying out of said duties promoted a legitimate penological objective. Similarly, Plaintiff's refusal to obey orders to show his hands so that photographs could be taken, pursuant to prison policy favoring preservation of evidence, triggered the issuance of a misconduct. When analyzing a retaliation claim, it must be recognized that the task of prison administrators and staff is difficult, and the decisions of prison officials require deference, particularly where prison security is concerned. *Rauser,* 241 F.3d at 334.

Moreover, it is also undisputed that after a hearing Plaintiff was found guilty of the underlying misconduct charges of threatening an employee, using abusive, obscene or inappropriate language to an employee, and twice, refusing to obey an order. In light of those undisputed considerations, Plaintiff has failed to satisfy the third prong of *Rauser*.

As to Plaintiff's claim that the officers' conduct was in retaliation for his refusing to answer questions about an altercation that occurred in the prison yard involving inmate Davis, he has not presented any evidence to support such a claim. He contends that the Defendants, including the hearing examiner McKissock, used the misconduct reports as a means of bypassing other institutional procedures for the investigation of inmate on inmate violence. There is nothing in the record to support such a claim and it appears to be a fabrication on the part of Plaintiff. This is simply not a case where the facts are unusually suggestive of a retaliatory motive. Defendants Hart, Burke and Byers each have filed declarations in which they deny retaliating against Plaintiff, deny discussing inmate Davis with Plaintiff, deny knowing Davis, and deny knowing anything about an alleged altercation involving Davis in the summer of 2011. Additionally, Captain Meure, who was in charge of investigations into allegations of staff abuse, reviewed inmate Cannon and inmate Davis' records, and found no evidence of any alleged

inmate on inmate assault in the summer of 2011 involving inmate Davis or Davis' cellmate Cannon. In fact, Meure explained that had such an incident occurred, Davis would not have been transferred to another institution to attend a welding program. Under these circumstances, no fact finder could infer that Plaintiff's alleged altercation with Davis or his refusal to answer questions about it was a substantial or motivating factor underlying the actions taken by any of the defendants.

Since it is apparent that the rational trier of fact could not conclude that the Defendants engaged in retaliatory conduct, Defendants are entitled to entry of summary judgment with respect to that allegation.

For these reasons, the Court will grant the Defendants' motion for summary judgment with respect to Plaintiff's retaliation claims.

### B.  Due Process

Plaintiff contends that Defendants' violated his procedural due process rights by filing misconduct charges against him, using questionable procedures during his misconduct hearings and unfairly placing him in the RHU. Plaintiff asserts that he is entitled to relief for having been transferred to a higher level security prison, further away from his home, and his lost opportunity to obtain his barber manager license. [ECF No. 8 at 4].

In analyzing any procedural due process claim, "the first step is to determine whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." *Shoats v. Horn,* 213 F.3d 140, 143 (3d Cir.2000) (citing *Fuentes v. Shevin,* 407 U.S. 67 (1972)). Once it is determined that a property or liberty interest asserted is protected by the Due Process Clause, the question then becomes what process is due to protect it. *Id.* (citing *Morrissey v. Brewer,* 408 U.S. 471, 481 (1972)).

14

In the case of prison inmates, the following principles apply:

> [i]n *Sandin v. Conner*, the Supreme Court announced a new standard for determining whether prison conditions deprive a prisoner of a liberty interest that is protect by procedural due process guarantees. Although the Court acknowledged that liberty interests could arise from means other than the Due Process Clause itself, the Court concluded that state-created liberty interests could arise only when a prison's action imposed an '<u>atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life</u>.' ... In finding that the prisoner's thirty-day confinement in disciplinary custody did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest, the Court considered the following two factors: 1) the amount of time the prisoner was placed into disciplinary segregation; and 2) whether the conditions of his confinement in disciplinary segregation were significantly more restrictive than those imposed upon other inmates in solitary confinement.

*Shoats,* 213 F.3d at 143–44 (citations omitted, emphasis added).

Applying these legal benchmarks, it has been held that confinement in administrative or punitive segregation will rarely be sufficient, without more, to establish the kind of "atypical" deprivation of prison life necessary to implicate a liberty interest. Courts within this circuit, applying *Sandin* in various actions, have found no merit in procedural due process claims presented regarding institutional disciplinary hearings which result in disciplinary custody placement. *See Torres v. Fauver*, 292 F.3d 141, 150–51 (3d Cir. 2002) (because prisoners can reasonably anticipate transfer to disciplinary custody, placement in segregation as a disciplinary sanction did not implicate a protected liberty interest); *Griffin v. Vaughn*, 112 F.3d 703, 706–08 (3d Cir. 1997) (no liberty interest in avoiding fifteen (15) month placement in administrative custody because said confinement was not atypical); *Smith v. Mensinger*, 293 F.3d 641, 645, 654 (3d Cir. 2002) (seven months of disciplinary confinement did not implicate liberty interest).

The Court finds that the conduct of Defendants as supported by the record does not give rise to an actionable due process claim. Plaintiff's disciplinary confinement does not constitute an atypical and significant hardship in relation to the ordinary incidents of prison life. Plaintiff

has failed to demonstrate any evidence to support such a claim. As such, Plaintiff's liberty interests were not implicated and his right to due process at the misconduct hearing was not triggered in the first instance. Defendants therefore cannot be found liable for violating Plaintiff's rights provided by the Fourteenth Amendment.

Prison disciplinary proceedings may, however, constitute a denial of due process in the context of a civil rights action under § 1983 when they are instituted for the sole purpose of retaliating against an inmate for his/her exercise of a constitutional right. *Smith v. Mensinger*, 293 F.3d at 653. In *Allah v. Seiverling,* 229 F.3d 220 (3d Cir. 2000), our court of appeals stated:

> *Sandin* instructs that placement in administrative confinement will generally not create a liberty interest. Retaliation may be actionable, however, even when the retaliatory action does not involve a liberty interest. [G]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right.

*Seiverling*, 229 F.3d at 224 (internal citations and quotation marks omitted). We find that, for the reasons previously discussed, the evidence of record establishes that the misconducts issued against the Plaintiff were issued solely due to plaintiff's own behavior and not for any retaliatory reasons. He refused to follow orders to submit to a pat down, was verbally abusive and threatening toward a officers, and refused to follow the order to have his hands photographed.

Moreover, to the extent that Plaintiff complains that the misconducts were falsified, it is well settled that a prisoner does not have a procedural or substantive due process right to be free from being falsely or wrongly accused of conduct that may result in the deprivation of a protected liberty interest. *Smith v. Mensinger*, 293 F.3d at 653-54; *see also Freeman v. Rideout*, 808 F.2d 949, 953 (2d Cir. 1986). Thus, Plaintiff's allegations of false misconducts, particularly with respect to the dismissed charge of presence in an unauthorized area, do not serve to resurrect his due process claims.

Finally, to the extent that Plaintiff alleges a violation of procedural due process, he does not appear to contest that he was given adequate notice and opportunity to be heard. Rather, he takes issue with the finding of guilt rendered by the hearing examiner. We find that the disciplinary decision was clearly supported by at least "some evidence", as required by due process jurisprudence. *Superintendent v. Hill*, 472 U.S. 445, 454 (1985). The hearing examiner reviewed the videotape, read a report by Defendant Hart and Defendant Byers, in addition to hearing Plaintiff's version of events, which she found lacked credibility. As such, Defendant McKissock based her determination on "some evidence" of Plaintiff's misconduct.

Parenthetically, we note that in his prayer for relief Plaintiff includes compensation for his damaged eyeglasses. A civil rights claim also cannot be brought to vindicate a prisoner's right to property when the deprivation occurs as a result of a tortious and unauthorized act where an adequate remedy exists to compensate those who have suffered tortious loss at the hands of the state. *Parratt v. Taylor,* 451 U.S. 527, 543–544, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). The United States Supreme Court has extended *Parratt* to include intentional deprivations of property, holding that where a prisoner has an adequate post-deprivation remedy under state law for any loss suffered to his property, a civil rights claim is not available. *Hudson v. Palmer*, 468 U.S. 517, 532–533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Consequently, regardless of whether the deprivation of property was the result of intentional or negligent conduct, a plaintiff may not obtain relief via a civil rights complaint if he or she has adequate alternative remedies. Proctor can assert any claim relating to a deprivation of his personal property via the DOC's administrative remedy system. He may also assert a loss of property claim in Pennsylvania state court. Since Plaintiff has both state court and administrative remedies available to him, his claim of improper deprivation of personal property will not be entertained.

For these reasons, Defendants' Motion for Summary Judgment will be granted with respect to Plaintiff's due process claim.

## C.     Cruel and Unusual Punishment / Excessive Force Claim

Plaintiff's Eighth Amendment claim is as follows:

> Officers shoved the Plaintiff face forward onto the ground while his hands were cuffed behind his back then pounced onto his back and neck with their knees and when officers carried the Plaintiff by his limbs toward the A.C. Status cell-block with his hands cuffed behind his back and when officer Hart shoved the Plaintiff's head against the floor of the medical cart crushing his eyeglasses against his face and the floor of the medical cart.

[ECF No. 12 at ¶ 8]. Plaintiff also states that he was forced to hold his hands in the air for seven minutes during the pat search. [ECF No. 8 at 7].

In the context of an excessive force claim, the core judicial inquiry of whether the measure taken inflicted unnecessary and wanton pain and suffering is that set out in *Whitley v. Alberts*, 475 U.S. 312 (1986): "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). In answering this question, a court's analysis "must be driven by the extent of the force and the circumstances in which it [was] applied[,] not [merely] by the resulting injuries" to a plaintiff. *Smith*, 293 F.3d at 648. In determining whether a defendant has used excessive force in violation of the Eighth Amendment, courts look to several factors including: "(1) the need for the application of force; (2) the relationship between the need and the amount of force used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts to temper the severity of the forceful response." *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (internal quotations and citation omitted). The extent of any injuries that an inmate suffers is relevant, but "does not end" this analysis. *Hudson*, 503 U.S. at 7. Consideration

of these factors permit a court to make inferences concerning "whether the use of force could plausibly have been thought necessary" or whether the circumstances show "such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley,* 475 U.S. at 321 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)).

It is apparent to this Court that under the factors announced in *Brooks* and *Whitley,* the actions taken by the Defendants officers were not an intentional sadistic attempt to inflict harm on Plaintiff but rather a good faith effort to diffuse a potentially volatile situation using as minimal amount of force as necessary. *See Wilson v. Horn,* 971 F.Supp. 943, 948 (E.D. Pa. 1997) (a plaintiff must establish that the force was applied maliciously and sadistically, instead of in good faith). The evidence before the court insufficient for an excessive-force claim. "Not every push or shove" violates an inmate's Eighth Amendment rights. *Hudson,* 503 U.S. at 9 (internal citation omitted). The Eighth Amendment does not protect an inmate against an objectively de minimis use of force. *Smith v. Mensinger,* 293 F.3d 641, 649 (3d Cir.2002). "Handcuffing inevitably involves some use of force," *Wertish v. Krueger,* 433 F.3d 1062, 1067 (8th Cir. 2006), and it almost inevitably will result in some irritation, minor injury, or discomfort where the handcuffs are applied, *Rodriguez v. Farrell,* 280 F.3d 1341, 1351 (11th Cir. 2002). To prove that the force applied was excessive in that context, therefore, a plaintiff must demonstrate something more. *See Fears v. Beard,* F.Appx,2013 WL 3834399 (3d Cir. July 25, 2013) (affirming summary judgment when the record did not reflect that the inmate was handcuffed for any reasons other than institutional safety and security); *Fisher v. City of Las Cruces,* 584 F.3d 888, 898 (10th Cir.2009) (holding that a handcuffing case requires a showing of an actual, non de minimis physical, emotional, or dignitary injury to succeed on a claim).

Defendants had to use force when they were confronted with Plaintiff's refusal to

cooperate during the pat search, his verbal threats, and his refusal to walk to the RHU unit. This is clearly not a case where the Plaintiff has any evidence that he was subjected to an intentional sadistic beating. Plaintiff was shown in the video recording being carried, placed on the ground so that the officers could reposition themselves, then being placed in a medical cart, and ultimately being transported to a cell. Throughout the video recording, he is heard swearing at the officers, and he continued to refuse to walk on his own. At no point was his face shoved or forced onto the ground, nor did the officers pounce onto his back and neck with their knees. There is likewise no evidence to support Plaintiff's contention that Defendant Hart shoved his head against the floor of the medical cart, "crushing" his eyeglasses against his face.

Moreover, the force which was exercised was not disproportionate to the threats and insulting behavior admittedly exhibited by Plaintiff and the force applied resulted in minimal injury. Admittedly, the videotape does not show what transpired prior to Plaintiff being handcuffed. Nevertheless, it casts light on the lack of injury inflicted and clearly shows Plaintiff's argumentative and verbally caustic and threatening demeanor, which leads us to infer that it is more than plausible that the de minimis use of force was thought necessary at the time. The record shows that at most, plaintiff suffered some abrasions to his chin, and possibly later suffered arm and back pain. Under these circumstances, no reasonable jury could find the wanton and unnecessary infliction of pain required to establish an Eighth Amendment violation with respect to the July 27, 2011 incident. Therefore, the court will grant the Defendant's Motion for summary judgment as to this claim.

### D. Amended Complaint

On January 16, 2015, the same day he filed his Memorandum of Law in Opposition to Motion for Summary Judgment [ECF No. 28], Plaintiff filed an "Amended Complaint to Target

All Defendants in Their Official Capacities and to Specify Damages and Redress Sought Hereby" ("Second Amended Complaint") [ECF No. 27] in which he seeks to amend his complaint to include specific damages in the amount of "one million, three hundred thousand dollars and an all expense paid full coverage health insurance policy, for the life of the plaintiff, provided by a health insurance provider selected by the plaintiff." Plaintiff did not seek leave to amend, contrary to the provisions of Fed. R. Civ. P. 15. We have reviewed this Second Amended Complaint and concluded that its allegations do not merit a response from the Defendants at this juncture. This District's Local Rules of Court concerning the procedure for pleading unliquidated damages expressly prohibit what Plaintiff has requested. See L.Cv.R. 8 ("No party shall set forth in a pleading originally filed with this Court a specific dollar amount of unliquidated damages in a pleading except as may be necessary to invoke the diversity jurisdiction of the Court or to otherwise comply with any rule, statute or regulation which requires that a specific amount in controversy be pled in order to state a claim for relief or to invoke the jurisdiction of the Court.") The exceptions to Local Rule 8 are inapplicable to the present case. Further, because the Amended Complaint filed on November 14, 2013 [ECF No. 8 at 6] already demands relief for compensatory and punitive damages, and has been construed as claims against the defendants in their official capacities, allowing the proposed amendment would be futile and will therefore be stricken. See Fed. R. Civ. P. 12(f) (imposing duty on the court to review pleadings and providing we may on our own initiative order stricken from any pleading any immaterial matter).

## Conclusion

For all the foregoing reasons, the Motion for Summary Judgment filed by Defendants

will be granted. An appropriate Order follows.

## **ORDER**

**AND NOW**, this 21st day of April, 2015, it is hereby **ORDERED** that the Motion for

Summary Judgment [ECF No. 21] filed by Defendants is GRANTED.

IT IS FURTHER ORDERED that the Amended Complaint [ECF No. 27] is hereby

STRICKEN.

IT IS FURTHER ORDERED that the Clerk of Court mark this case CLOSED.


                                    s/ Cynthia Reed Eddy
                                    Cynthia Reed Eddy
                                    United States Magistrate Judge


cc:     ANTHONY E. PROCTOR
        SCI-Benner Township
        301 Institution Drive
        Bellefonte, PA 16823

        Yana L. Warshafsky
        Office of the Attorney General
        Email: ywarshafsky@attorneygeneral.gov

22